[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM ON APPLICATION FOR PREJUDGMENT REMEDY
The plaintiff has sued his former employer, Gemini Network, Inc. ("Gemini") and its president, Arnold Chase ("Chase"), for the tort of wrongful discharge, for a violation of General Statutes § 31-72, and for a breach of contract and the covenant of good faith and fair dealing.[1] In the pending application, the plaintiff has asked the court to order a prejudgment remedy ("PJR") pursuant to Chapter 903, G.S. The court has held a hearing on the application and now issues its order pursuant to § 52-278d.
At the hearing, the following facts were developed. The plaintiff was unemployed in the summer of 1999, but had had over twenty-five years' experience as an engineer in the cable television field. While considering offers for positions with two national cable companies, he was approached by Chase and asked to join his start-up telecommunications company.[2]
At a meeting on September 1, 1999, the plaintiff and Chase discussed the plaintiff's employment with Gemini. Chase explained that the plaintiff was to supervise all technical aspects of the new company. The plaintiff was initially cautious in accepting Chase's offer, but Chase explained the other successful ventures[3] that he and his family had had, as well as the personal investment in Gemini that he had committed to make. He assured the plaintiff that if Gemini proved to be a similar success, he would share in the reward. Chase mentioned that Gemini might be worth $100 Million in five years, and if so, the plaintiff would receive 1% of this figure.
After the plaintiff and Chase had exchanged a series of preliminary drafts, Chase, acting as president of Gemini, sent the plaintiff a letter outlining the terms of the company's offer to hire the plaintiff as Vice President of Network Development. This document provided in relevant part as follows: CT Page 1862
 1. Description of the Position: A general description of your responsibilities is set forth in Exhibit A.[4] . . .
 3. Salary: You will receive a base salary of $156,000.00 per year . . . Subject to your continued employment with Gemini, you will receive a guaranteed increase of 10% of your base salary after the first year. After each of your second and third years of employment, any increases will be based on performance reviews.
 4. Signing Bonus: You will receive a signing bonus of $20,000 within 10 (ten) days after the commencement of your employment with Gemini.
 5. Performance Bonus: [Ranging from 20% to 60%, depending on achieving budgetary and performance goals] . . .
 11. Stock Option Plan: Gemini guarantees that you will receive stock options over the next five (5) years that will be worth at least $1,000,000. You will vest 33% after three (3) years, 66% after four (4) years and be fully vested after five (5) years. Subject to your continued employment, Gemini guarantees that the cash value of these stock options will be at least $1,000,000 after five (5) years. If at the end of five (5) years, the stock options are not worth $1,000,000 Gemini will provide cash compensation to cover the difference.[5]
 12. Severance Under Certain Circumstances: [If a transfer of Gemini occurs during the first three years of your employment and you do not receive a comparable position with the new ownership, you are entitled to receive payment of one year's salary.]
 If you are terminated by Gemini within your first three (3) years of your employment and your termination is not "for cause" . . . you will be entitled to receive an amount equal to six (6) months . . . salary . . .
 14. Employment Status: You acknowledge and agree that you are employed by Gemini on an "at will" basis, i.e., you or Gemini can terminate the employment relationship for any reason or for no reason, and nothing in this letter is deemed to modify your status as an "at will" employee.
 As an employee at Gemini, certain benefits and services are or may be provided by David T. Chase Enterprises, Inc. or Chase affiliated entities ("Chase Entities"). You hereby acknowledge and agree that no employment or relationship shall or will exist between you and any of the Chase Entities, and the Chase Entities owe you no duty other than any duty specifically established by the administration of any such CT Page 1863 benefits.
 The terms set forth in this offer letter will be formalized in a more definitive employment contract between you and Gemini which will be provided to you in due course following your acceptance of the terms and conditions of this letter[6] . . . If the foregoing is acceptable to you, please sign below to indicate your understanding and acceptance of the terms outlined in this letter . . .
The letter was subsequently signed by both the plaintiff and Chase. The parties do not dispute that the plaintiff commenced work under this letter agreement and received his salary and bonuses as set forth therein.
In March 2000 two modifications were made to paragraph 11 above, what plaintiff referred to at the hearing as his "million dollar guarantee."[7]
The plaintiff agreed to change his stock options to 1,000,000 shares of restricted stock. On termination of employment, the plaintiff would forfeit all unvested shares. The vesting periods were identical to those set forth in paragraph 11, except that vesting would occur at once on change of control. Under the Long-Term incentive plan adopted by the Gemini Board of Directors, the plaintiff was obliged to deposit his restricted stock with Gemini's general counsel, who would release the shares as vesting occurred.[8]
Work commenced under this arrangement, and the plaintiff was successful in obtaining pole licensing agreements and in helping to design Gemini's network. By the beginning of 2001, however, Gemini executives had witnessed a collapse of the telecommunications market. Gemini had only one hundred customers and was providing services only in West Hartford, Connecticut.
In the summer of 2001, it was decided that Gemini had to enter a "hibernation" phase until the credit situation improved. The managers entered into new compensation contracts with the company. The plaintiff also was aware of the difficulties facing Gemini: he knew that the company had laid off two-thirds of its employees, that the actual wiring of poles had taken place only in the Greater Hartford area and that there were only one hundred customers.
The plaintiff did not come to agreement with Gemini during the summer of 2001 as did the other managers, but eventually negotiated a modification of his September 30, 1999 letter agreement on November 8, 2001. A letter written by Chase and accepted by the plaintiff provided in part as follows: CT Page 1864
 Gemini . . . and you enter into this letter agreement . . . which constitutes an amendment to your Agreement . . . dated September 30, 1999.
 The financial markets are having significant difficulties at this time, making financing buildout of Gemini's planned networks difficult. Gemini is undergoing a significant reduction in force and is going into a hibernation phase in order to survive until the financial markets improve. ("Hibernation" is defined as the period beginning now and ending on the earlier of (a) successful closing of funding sufficient to reactivate Company operations and re-initiate construction of its broadband networks in an amount of at least $10 Million, net of all closing costs (an "Additional Financing") and (b) July 15, 2002.)
 1. [Regarding] [y]our [base annual salary], you agree to receive [a salary reduced to 80%] and defer 20% of your Base Annual Salary (the "Deferred Salary").
 2. If Gemini closes on an Additional Financing during Hibernation, Gemini will pay you Deferred Salary accrued since Reduced Annual Salary became effective. At that time, Gemini will resume paying you Base Annual Salary on a going forward basis.
 3. If Gemini does not close an Additional Financing during Hibernation, Gemini will have no obligation to pay you accrued Deferred Salary. If you voluntarily terminate your employment with Gemini during Hibernation, you will not be entitled to Deferred Salary.
 4. [If terminated during Hibernation, you will receive four months severance pay.]
 5. Reference is made to Paragraph 11 of [the September 30th] Agreement. All references to "stock options" therein are deleted and replaced with "Restricted Stock," as defined in the Stockholder's Agreement . . . [Paragraph 11 is then set forth in full with the only change being the reference to restricted stock, instead of stock options.]
 6. Except as modified herein, all terms of your Agreement [of September 30, 1999] remain in full force and effect. Specifically, those provisions of your Agreement other than those laid out herein will remain unchanged (e.g. benefits, vacation etc.). In addition, (a) upon closing of an Additional Financing during Hibernation and (b) if you have remained a Gemini employee and are not in breach of your CT Page 1865 Agreement, all aspects of your Agreement will return to full force and effect as if this Amendment had never been executed by you and Gemini . . .
 Gemini greatly appreciates the efforts that you have made to date and the revision to your Agreement that you are agreeing to in order to help Gemini reach its goals.
With this modification, the plaintiff remained an "at will" employee with a reduction in salary to last until the infusion of $10 Million or July 15, 2002. In May 2002, the additional investment had not occurred, and the parties began to negotiate an agreement to replace the November 8th agreement. Chase and two other officers of Gemini told the plaintiff that language similar to paragraph 11 could not be in the agreement to follow that of November 8th. They stated that Gemini could no longer afford to make the plaintiff this guarantee.[9] On May 29, 2002, John Redding, Vice President of Gemini, sent a memorandum to the plaintiff, recognizing his status as an employee "at will" and summarizing what Gemini would offer in "extending your employment for an additional year." These terms included leaving the plaintiff's salary at the hibernation rate, offering him bonuses for settling two claims pending against Gemini, continuing his health and retirement benefits, but discontinuing his housing allowance.
With regard to the so-called "guarantee" found in the September 30th agreement, paragraph 11, the memorandum stated that "[t]he time restrictions on the Restricted Stock [i.e. the vesting] that you received pursuant to the Gemini Long Term Incentive Plan will continue to lapse consistent with the terms of your Stockholder's Agreement. However, there will be no Gemini guarantee as to the value of such Restricted Stock."
The plaintiff replied to this memorandum on June 3, 2002, and June 18, 2002. The plaintiff's reply did not significantly differ except for the provision referring to the September 30th, paragraph 11, guarantee. In his June 3rd reply, the plaintiff stated: "Thank you for allowing the time restrictions on the Restricted Stock that I will receive pursuant to the Gemini Long Term Incentive Plan, which will continue to lapse consistent with the terms of my Stockholder's agreement. In regards to Gemini guaranteeing the value of the Restricted Stock, I require that this term remain in place. One of my key considerations for joining the Gemini team was this guarantee of value of the Restricted Stock, which I consider as wages." The June 18th memorandum offered a compromise: "I am agreeable to modifying the $1,000,000 guarantee to occur only in the event that there is not a funding event by a third party in the amount of $10,000,000 prior to July 15, 2004, then the guarantee will be reduced to $250,000. CT Page 1866 However, I am not agreeable to modifying the $1,000,000 guarantee if there is a funding event by a third party in the amount of $10,000,000 prior to July 15, 2004."
These efforts at reaching an agreement to take effect after July 15, 2002 were not successful. Instead on June 20, 2002, Chase sent a letter to the plaintiff terminating his employment effective June 21, 2002. This letter also terminated the September 30, 1999 agreement as amended on November 8, 2001. Under the June 20th letter, the plaintiff was to receive the four-month severance pay required by the November 8th modification.
With regard to the restricted stock, the letter stated that this was to be forfeited as the "time restrictions" had not lapsed pursuant to the stockholder's agreement that modified the September 30th agreement, paragraph 11. Were Gemini able to raise additional capital, then the plaintiff would be eligible to be re-hired and his vesting rights would continue.
After this letter was sent to the plaintiff, the next day he was tendered a possible employment agreement for a term of one year, ending on June 21, 2003, with a salary of $137,280 and additional bonuses. "Thereafter, Employee shall be an employee at will." With regard to the restricted stock, the proposed agreement stated that Gemini and the plaintiff acknowledge that the lapsing or vesting would continue as set forth in the shareholder's agreement. "The Employee acknowledges that the guarantee of the value of the Restricted Stock . . . is no longer in effect because the Company has terminated [the September 30th and November 8th agreements] pursuant to the termination letter from the Company to the Employee dated June 19, 2002. Employee acknowledges that the terms of this Agreement do not guarantee to Employee any value whatsoever of the Restricted Stock now or at any time in the future."
On June 25, 2002, the plaintiff acknowledged by memorandum that he had received his termination letter and the proposed one-year contract. He stated: "[I]t seems apparent that the main purpose of these documents is to eliminate the Restricted Stock guarantee. I have stated on several occasions how important the guarantee was in swaying and enticing me to join Gemini Networks. I wish to voice how I was confused and hurt with the process of terminating my employment, and then reinstating my employment with a new agreement. Other staff members, who like myself, have letters of understanding and/or employment agreements, were not terminated." He offered to reduce the guarantee to $500,000, if no additional outside capital was obtained. The plaintiff also attached a table of other changes, including seeking to have his employment contract CT Page 1867 end after two years, instead of one.
The efforts to reach an agreement on a contract after the plaintiff's termination were not successful. The plaintiff remained at Gemini under an understanding that he was an independent contractor-consultant, paid at the rate of $660 per day. At the beginning of July 2002, Gemini tendered to the plaintiff two documents. The first was a formal consulting agreement; the second was another version of the one-year employment contract that the plaintiff had previously rejected. On July 12, 2002, the plaintiff tendered a slightly-altered version of the consulting agreement to Gemini, but it was rejected as it was not presented by the plaintiff's recently-hired attorney. The plaintiff was asked to leave his employment at the close of business on July 12, 2002, and he was escorted from Gemini's offices.
The plaintiff has now applied for a prejudgment remedy in connection with his proposed lawsuit, making the claims as indicated above. In order to obtain a PJR, the applicant need only establish probable cause for the validity of its claim. State v. Ham, 253 Conn. 566, 569 (2002). Section 52-278d provides that if probable cause is established that judgment will be rendered in the applicant's favor in the amount sought, the PJR should be granted. The hearing on such an application is not a full-scale trial on the merits, but concerns only whether the applicant is entitled to retain custody of the defendant's property pending final adjudication.Soltesz v. Miller, 56 Conn. App. 114, 116 (1999). At the hearing, the court evaluates the evidence and arguments to determine whether there is probable cause to sustain the validity of the applicant's claim. East Lymev. Wood, 54 Conn. App. 394, 397 (1999).
The applicant need not prove that the claim will definitely succeed at trial, but only that there is probable cause to sustain the legitimacy of the claim. Giordano v. Giordano, 39 Conn. App. 183, 206 (1995). For purposes of § 52-278d, "probable cause" is "a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a person of ordinary caution, prudence and judgment, under the circumstances, in advancing the action." Tyler v. Schnabel,34 Conn. App. 216, 219-20 (1994) (claim under the fraudulent transfer act). It "is a flexible common sense standard that does not demand that a belief be correct or more likely true than false." Fischel v. TKPK,Ltd., 34 Conn. App. 22, 24 (1994).
In addition to bearing the burden of establishing the probability that a defendant is liable under one or more of the claims alleged, a plaintiff seeking a PJR must also establish the probable amount of his damages through testimony at the probable cause hearing or by documentary CT Page 1868 proof. Essex Group, Inc. v. Ducci Electric Co., 181 Conn. 524 (1980);Mullai v. Mullai, 1 Conn. App. 93, 94 (1983).
Under the law as stated above, the court must evaluate the plaintiff's complaint as well as the evidence presented by both sides at the hearings held on the PJR application. The plaintiff claims in his second count to bring a suit for his "equity interest," that is, the $1 Million guarantee, under General Statutes § 31-72 as an action for unpaid "wages." In § 31-71a (3) the term wages is defined to include "compensation for labor or services rendered by an employee." The plaintiff was compensated for his employment through his final day of work at Gemini, and therefore he has no claim under § 31-72. The court also agrees with those Superior Court cases that have held that unvested stock options are not "wages" under § 31-72. Shafton v. DSL Net,Inc., Superior Court, judicial district of New Haven at New Haven, Docket No. CV 00 0438890 (February 28, 2001, Jones, J.); Swihart v. Country HomeBakers, Inc., Superior Court, judicial district of Ansonia/Milford at Milford, Docket No. CV 97 060945 (December 3, 1998, Corradino, J.). The promise of the "one-million dollar guarantee" similarly would not fall under the protection of § 31-72.
The plaintiff's third count is that Gemini breached a covenant of good faith and fair dealing in his termination, because he insisted on his guarantee. This count is based on Restatement, Second, Contracts § 205, that every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement. A comment to § 205 gives the example of the refusal to fulfill a contractual obligation, not prompted by an honest mistake as to one's rights or duties. See Elm StreetBuilders, Inc. v. Enterprise Park Condominium Assn., Inc.,63 Conn. App. 657, 667 (2001); Warner v. Konover, 210 Conn. 150, 155
(1989).
It has been held, however, that this covenant does not apply to an "at will" employment situation, or at most is identical to an action for wrongful discharge in tort. Magnan v. Anaconda Industries, Inc.,193 Conn. 558, 572 (1984); Battista v. United Illuminating Co.,10 Conn. App. 486, 495 (1987). Here since the plaintiff was an "at will" employee at the time of his termination on June 20, 2002, the court will discuss this allegation in terms of the proposed first count of his complaint.
The first count alleges that the plaintiff was terminated solely because he insisted on his "million dollar guarantee." (Proposed complaint, count one, paragraph 10.) This cause of action is claimed to be based on the tort of wrongful discharge, available to "at will" CT Page 1869 employees under Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471
(1980). Sheets "recognized a common law cause of action in tort for a demonstrably improper reason for dismissal, a reason whose impropriety is derived from some important violation of public policy." Id. at 475.
Several Superior Court decisions have held that the termination of an "at will" employee solely to avoid vesting of certain rights to compensation violates public policy and states a claim for wrongful discharge. See Cook v. Alexander Alexander, 40 Conn. Sup. 246, 248
(1985) ("By alleging that the plaintiff was discharged in order to avoid payment of bonuses and the vesting of thrift plan benefits, the plaintiff has sufficiently alleged a wrongful discharge within the contemplation ofSheets"); Okon v. Medical Marketing Group, Inc., Superior Court, judicial district of Fairfield at Bridgeport, Docket No. CV 93 306032S (August 18, 1994, Pittman, J.) (12 Conn.L.Rptr. 228) (a complaint alleging that plaintiff's employment was terminated in order to prevent the vesting of certain rights to compensation which, if vested, would be enforceable under the wage protection statutes states a cause of action for wrongful termination); Leue v. Computer Sciences Corp., Superior Court, judicial district of Hartford at Hartford, Docket No. CV 01 811784 (March 15, 2002, Wagner, J.) (31 Conn.L.Rptr. 528) ("This Court is in agreement with the Superior Court cases that view the wage statutes as expressing a public policy against the withholding of wages earned. Accordingly, a plaintiff may plead a wrongful discharge claim by alleging that the plaintiff was discharged so as to avoid the payment of other compensation that, if vested, would have accrued"). The rationale behind these holdings is to uphold the public policy of preventing overreaching by employers and the forfeiture by employees of benefits earned by the rendering of substantial services. Fortune v. National Cash RegisterCompany, 364 N.E.2d 1251, 1257 (Mass. 1977).
Gemini argues that the plaintiff has failed to prove that he was terminated solely to eliminate his guarantee: The plaintiff's termination came with other management employees; the plaintiff knew of the dire financial circumstances of Gemini in June 2002; the plaintiff voluntarily signed the reduction in salary agreement of November 8, 2001; in that agreement the plaintiff acknowledged that he could be terminated for business reasons; the plaintiff's guarantee was to be triggered only in the fifth year of his continued employment with Gemini; and the plaintiff made alternative offers to Gemini in June 2002 regarding the amount of the guarantee. On the other hand, Gemini was prepared to offer the plaintiff a contract for one year with virtually identical terms to his September 30, 1999 contract, but without the guarantee present. The plaintiff has shown probable cause for his contention that his termination resulted from his insistence that the CT Page 1870 guarantee continue, and Gemini's decision that he could not continue to be employed with the guarantee in his contract.
Turning to the question of the appropriate level of attachment, the court must consider a "fair and reasonable estimate" of the likely potential damages. Rafferty v. Noto Brothers Construction, LLC,68 Conn. App. 685, 693 (2002). As the plaintiff acknowledges at page 13 of his brief, the court must make "some consideration of the amount of damages which may be found upon a full trial." Burkert v. Petrol Plus ofNaugatuck, Inc., 5 Conn. App. 296, 301 (1985), quoting LedgebrookCondominium Assn., Inc. v. Lusk Corporation, 172 Conn. 577, 585 (1977).
"One area of law which remains unclear under Connecticut law is the scope, extent and measure of damages available in a tort claim for termination of employment . . . [F]ew decisions have discussed damages."Tort Remedies in Connecticut, Richard L. Newman, Jeffrey S. Wildstein, § 22-5 (a), Damages: Wrongful Discharge, p. 307 (1996); but seeConnecticut Labor Employment Law, 2nd Ed., Ch. 9: Exceptions to the Employment-at-Will Rule, p. 304 (2001) (in a wrongful discharge action brought under the Sheets doctrine, "[t]he successful employee may seek back or front pay, punitive damages and damages for emotional distress").
In Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc., 234 Conn. 1,662 A.2d 89 (1995), the Supreme Court upheld the trial court's award of damages in an action for breach of an implied contract of employment. "To determine the amount of economic damages from lost wages, the [trial] court engaged in the following analysis. First, it estimated what the plaintiff would have earned if he had remained employed by the defendant until the end of 1992 [which is approximately when the trial court issued its decision that the defendant was liable, on January 25, 1993]. Next, it computed the sum of: (1) the wages the defendant in fact had earned at other jobs between the date of his termination and the date of his trial testimony in October 1991, and (2) the wages the defendant probably would have earned between the date of his trial testimony and the end of 1992. It then awarded the plaintiff the difference between the first sum and the second . . ." Id., 32. The Supreme Court affirmed the trial court's award "[b]ecause each of the findings was based on reasonable inferences and estimates from the evidence presented . . ." Id., 33. In addition, the Supreme Court held that damages for wages for the period after the conclusion of trial, commonly known as "future lost wages" or "front pay," "can be awarded in actions for breach of an implied contract of employment, as long as they are limited to a reasonable time and are supported by the evidence." Id., 33-34. CT Page 1871
The relief requested for the plaintiff's wrongful discharge claim is lost earnings and benefits. (Proposed Count One, ¶ 11.) The plaintiff suggests that the attachment should be for at least $1.375 Million.[10] "Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." (Internal quotation marks omitted.) Gaudiov. Griffin Health Services Corp., 249 Conn. 523, 554, 733 A.2d 197
(1999). The evidence at the hearing shows that it was speculative that the plaintiff would have been employed beyond June 21, 2003. Both exhibits 10 and 13, the proposed contract of employment tendered to the plaintiff, indicate that Gemini had placed a one-year limit on the plaintiff's services. The plaintiff was needed to prepare a twelve-month budget for Gemini. Exhibit 10, page 1. His employment assignment in 2002 was to continue to reduce the outstanding liabilities of Gemini, including certain contractual obligations that Gemini could no longer meet. (Transcript, December 12, 2002, p. 146.) The plaintiff tried to obtain different terms in this proposed employment contract, such as to lengthen the term, but was unsuccessful. See Exhibit 11. As the plaintiff testified: "And as Arnold Chase then stated [in June 2002], that Dan, I wish to have you continue your employment. He said I'm looking at it on a year-by-year basis." Transcript, December 4, 2002, p. 74.[11]
The court concludes that the plaintiff has shown probable cause for damages in the amount of $137,280 in wages and a bonus of $35,000 as set forth in the proposed contract (Exhibits 10 and 13) for a total of $172, 280. In addition, as the restricted shares would have vested by one-third by June 21, 2003, the plaintiff is entitled to an attachment for one-third of his outstanding stock. The defendants ask the court to hold an additional hearing if a prejudgment remedy is allowed, citing §52-278d (a) (4). The parties shall contact the clerk's office to arrange the hearing.
So ordered.
Henry S. Cohn